Filed 8/17/21

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>IAN CZIRBAN,<br><br>    Defendant and Appellant. | H047748<br>(Monterey County<br> Super. Ct. No. SS170589A) |


Appellant Ian Czirban was charged with a number of regulatory crimes following a fatal July 2016 accident involving his bulldozer, which had been assisting the California Department of Forestry and Fire (Cal Fire) at a wildfire in Monterey County. After a bench trial, the trial court convicted Czirban of procuring or offering a false or forged instrument, tax evasion, failure to collect, account for, or pay taxes, and misdemeanor failure to secure payment of workers' compensation insurance. For these convictions, the trial court suspended imposition of sentence and placed Czirban on felony probation for three years with various conditions, including the payment of a $10,000 fine under Labor Code section 3700.5.

On appeal, Czirban contends that his convictions for tax evasion, failure to pay taxes, and failure to secure payment of workers' compensation insurance must be reversed because he did not have an employment relationship with his bulldozer drivers, an element of those offenses. Czirban further contends that this matter should be

remanded to allow the trial court to reduce his probationary term under Assembly Bill No. 1950 (2019-2020 Reg. Sess.) (Assembly Bill 1950) and because the trial court failed to understand that it had discretion whether to impose the $10,000 fine.

For the reasons explained below, we reverse the order of probation and remand this matter for resentencing with directions to the trial court to modify Czirban's probationary term in accordance with Assembly Bill 1950. We also direct the trial court to issue a new sentencing minute order upon Czirban's resentencing to reflect the oral pronouncement of judgment. In all other respects, we affirm the judgment.

## I.  FACTS AND PROCEDURAL BACKGROUND

A. *Procedural Background*

In May 2018, the Monterey County District Attorney filed an information charging Czirban with insurance fraud (Pen. Code, § 550, subd. (b)(3); count 1), workers' compensation fraud (Ins. Code, § 11760, subd. (a); count 2), two counts of procuring and offering a false or forged instrument (Pen. Code, § 115, subd. (a); count 3 [occurring on or about March 15, 2016] and count 4 [occurring on or about May 2, 2014]), tax evasion (Unemp. Ins. Code, § 2117.5[1]; count 5), failure to collect, account for, or pay taxes (§ 2118.5; count 6), and misdemeanor failure to secure payment of workers' compensation insurance (Lab. Code, § 3700.5, subd. (a); count 7).

Czirban waived his right to a jury trial and was tried by the court in 2019. During trial, the district attorney moved to dismiss count 1, and the trial court granted the motion. At the close of trial, the court found Czirban guilty of counts 4 through 7 and not guilty of counts 2 and 3. The trial court did not state any explicit factual findings or issue a written decision regarding the offenses submitted for verdict.

In December 2019, the trial court suspended imposition of sentence and placed Czirban on probation for three years with various conditions. One of the probation

---

[1] Unspecified statutory references are to the Unemployment Insurance Code.

conditions (condition No. 17) required Czirban to pay a $10,000 fine under Labor Code section 3700.5 to the California Workers' Compensation Fraud Account through the Monterey County Revenue Department.[2]

Czirban timely appealed.

B. *Evidence Presented at Trial*[3]

The parties stipulated that, on July 26, 2016, Robert Reagan III, was operating a bulldozer owned by Czirban at the Soberanes wildfire in Monterey County. Reagan was ejected from the bulldozer and suffered fatal crushing injuries as the bulldozer rolled on top of him. He died instantly.

Following the accident, Cal Fire examined the workers' compensation insurance information it had on file for Czirban, and an investigation into Czirban's business commenced.

Czirban owned Czirban Concrete Construction. The business was first licensed as a concrete contractor in February 2010, by the California Contractors State License Board (CSLB). Czirban's ex-sister-in-law, Ashley Taylor, was his insurance broker for several years. Between 2011 and 2014, Taylor helped Czirban acquire for his business three workers' compensation insurance policies from the State Compensation Insurance Fund (State Fund). The first policy went into effect in May 2011, but it was canceled in October 2011, for "[f]ailure to make premium payment when due and failure to report

---

[2] Although the sentencing minute order does not mention the $10,000 Labor Code fine, the trial court's oral pronouncement makes clear that it imposed condition No. 17. "As a general rule, when there is a discrepancy between the minute order and the oral pronouncement of judgment, the oral pronouncement controls." (*People v. Contreras* (2015) 237 Cal.App.4th 868, 880.) We discuss further the omission of this fine from the sentencing minute order when addressing Czirban's challenge to its imposition. (See section II.C., *post*.)

[3] We describe the evidence that is most relevant to the contested factual issue posed by Czirban's appeal—namely Czirban's business practices and information he supplied to agencies of the State of California.

3

payroll with premium when due." The cancellation led to a suspension of Czirban's contractor's license for failure to maintain workers' compensation insurance.

In June 2012, Donald Bartunek, an enforcement representative with CSLB, investigated some work being done by Czirban Concrete Construction.[4] Bartunek encountered three workers (including Czirban's brother) at a job site. Bartunek checked CSLB's database to see if Czirban Concrete Construction was licensed. He learned that it was licensed and had submitted an exemption from workers' compensation insurance dated December 2011. On the exemption form, Czirban had endorsed the statement, "I do not employ anyone in the manner subject to the workers' compensation laws of California."

After Bartunek determined that the workers were not employees of the homeowner, he issued a stop order. Later that day, Bartunek spoke to Czirban. Czirban told Bartunek, " 'These are my employees.' " Bartunek discussed with Czirban the requirement for workers' compensation insurance and Czirban indicated that he "knew that." Czirban asked Bartunek for a "warning for not having workers' compensation insurance" because "he was seeking it" and "was going to get it." Bartunek told Czirban "there was no warning." Based on Bartunek's investigation, CSLB cited Czirban for filing a false workers' compensation exemption form. CSLB found that "in June of 2012 Mr. Czirban had employees and at that time should have had workers' [compensation]" insurance in place. CSLB also suspended Czirban's contractor's license for a time.

Czirban's second workers' compensation insurance policy from State Fund went into effect on January 28, 2013. However, that policy was canceled in September 2013, for failure to pay the premium and failure to submit payroll reports when due.

Czirban's third policy from State Fund (No. 9086514-14) was issued with effective dates of January 18, 2014, through January 18, 2015. That policy, however,

---

[4] Bartunek's testimony was admitted for the limited purpose of showing Czirban's knowledge, motive, or absence of mistake. (See Evid. Code, § 1101, subd. (b).)

4

was rescinded in early February 2014 (with the rescission applicable as of January 18, 2014), because Czirban's initial deposit check was returned for insufficient funds. Prior to the recission, a certificate of liability insurance coverage, dated January 22, 2014, was issued by Czirban's insurance brokerage to CSLB. Czirban's broker, Taylor, also sent a copy of that certificate to Czirban. Taylor never sent a certificate to Cal Fire and never handwrote information onto a certificate to include additional certificate holders. When shown at trial the certificate possessed by Cal Fire that listed it as a certificate holder (in addition to CSLB), Taylor did not recognize some handwriting on it. According to Taylor, neither the insurance brokerage nor State Fund would handwrite information for a certificate holder onto a certificate of insurance coverage.

On February 20, 2014, Czirban spoke with a State Fund employee about the rescinded workers' compensation insurance policy. State Fund's activity log entry for this conversation noted, "[Czirban] called regarding rescinded policy. Explained that new quote will be necessary and that he should have his broker submit a new application. [Czirban] understood and will contact his broker." State Fund never sent any correspondence or notifications about the rescinded policy to Cal Fire.

In April 2014, Czirban applied to the California Department of General Services for a small business certification. The application (which was signed under penalty of perjury) stated that Czirban Concrete Construction had an average of "2" employees "for the last four quarters" (capitalization omitted).

Also in April 2014, Czirban met with Cal Fire heavy equipment coordinator Marc Lingenfelter about "the process of getting signed up to be an equipment vendor" for Cal Fire pursuant to an Emergency Equipment Rental Agreement (EERA). Lingenfelter understood that Czirban owned a concrete construction company and an EERA for Czirban's bulldozer would be "a new venture" for Czirban. Cal Fire enlisted help from private vendors like Czirban through their EERAs to augment and support Cal Fire's fire suppression activities. Pursuant to an EERA, Cal Fire could call on a vendor to provide

5

equipment and equipment operators (including bulldozers and bulldozer drivers) as needed during an emergency incident. The vendor was required to have certain insurance including either workers' compensation insurance for employees or "major medical insurance" for independent contractors. Cal Fire would not execute an EERA without the requisite proof of insurance from the vendor and an inspection of the vendor's equipment.

When Cal Fire needed assistance from an EERA vendor at an emergency incident, Cal Fire could ask the vendor to provision its equipment as a "12-hour resource" or a "24-hour resource." If the vendor accepted a 24-hour resource request, the vendor would have to provide the equipment to Cal Fire for work 24 hours a day. When equipment was provided as 24-hour resource, the vendor received higher compensation for the assignment and had to provide two equipment operators who would each work 12-hour shifts. In addition, if a vendor was a certified small business, the vendor was prioritized for contact by Cal Fire to provide equipment.

In early May 2014, Czirban and Lingenfelter met again, and Cal Fire (through Lingenfelter) and Czirban Concrete Construction (through Czirban) signed an EERA on May 2, 2014. The EERA covered the provision of Czirban's bulldozer, operators, and tractor-trailer transport vehicle from May 2014, through April 2017.[5] Cal Fire's file for Czirban's EERA contained a certificate of insurance, dated January 22, 2014, for workers' compensation insurance from State Fund (under policy No. 9086514-14). The certificate had Cal Fire's name and address handwritten into a section titled "certificate holder" (capitalization omitted). CSLB also was listed as a certificate holder but, by contrast to Cal Fire, CSLB's name and address was in typewritten font. No other document in Cal Fire's EERA file for Czirban Concrete Construction addressed whether the business had workers' compensation insurance after the January 18, 2015 end date

_____

[5] The agreement was amended in 2015, to reflect a payment rate increase for the transport vehicle.

stated on the certificate. The file also did not contain any proof of major medical insurance for Czirban's business.

Between June 2014 and September 2015, Czirban Concrete Construction completed multiple wildfire assignments for Cal Fire. Some of the assignments involved the work of Czirban and an additional bulldozer driver.

On November 5, 2014, Czirban's broker, Taylor, sent him an e-mail about the cancellation of his State Fund workers' compensation policy, his general liability policy, and his "bond." Taylor wrote regarding the workers' compensation insurance: "We quoted your workers compensation on 01-18-14. The deposit check to State Fund was not honored by [the] bank so they flat cancelled the policy back to inception but the notice was sent on 02-11-14. We had issued a certificate to CSLB on 01-22-14 to put the workers comp on your license which is on there now. We re-quoted the comp for you on 04-02-14 and you never sent the deposit payment to State Fund so no policy was issued. The license board has not updated your license to show the cancellation on the policy. You have not paid for a policy nor have coverage. The license is reflecting a current policy which is not the case and is incorrect. If you are working with employee[]s[,] you do not have an active policy and [are] in violation. Your license should be suspended and will [be] if workers comp is not in place asap." Later that day, Czirban responded, "Can u quote these still or do [I] have to find another insurance place because of the cancellations." This was the last e-mail that Taylor exchanged with Czirban as his insurance broker.

In late November 2014, Appalachian Underwriters (Appalachian) received an application for workers' compensation insurance from "Ian Czirban, DBA Czirban Concrete Construction," through a retail insurance agent. The application reflected an estimated annual business payroll of $40,000 and three fulltime employees. In addition, in the application, Czirban described his business as a "Concrete Contractor doing foundations and flat work." Nowhere in the workers' compensation insurance

7

application or a related questionnaire did Czirban disclose the EERA that his business had signed with Cal Fire.

Through Appalachian, Czirban obtained a workers' compensation insurance policy with National Liability and Fire Insurance Company (National Liability and Fire), effective December 1, 2014, through December 1, 2015. However, on January 28, 2015, National Liability and Fire canceled Czirban's policy for "non-payment of premium;" the policy was never renewed. (Capitalization omitted.)

In December 2015, CSLB suspended Czirban's contractor's license for failure to obtain or maintain workers' compensation insurance.

In March 2016, when Czirban renewed his contractor's license with CSLB, he submitted another exemption from workers' compensation insurance. As he had in his previous December 2011 exemption, Czirban stated in this exemption, "I do not employ anyone in the manner subject to the workers' compensation laws of California."

On Sunday, July 24, 2016,[6] Cal Fire contacted Czirban to assist with the Soberanes wildfire in Monterey County. Czirban asked his friend David Vonderahe to help with the Soberanes assignment. Vonderahe worked fulltime for Caltrans as a construction equipment operator and had "major medical insurance" at that time. Vonderahe agreed to work with Czirban on the Soberanes fire assignment from Sunday, July 24 through Wednesday, July 27.

Late on July 24, Vonderahe drove Czirban's tractor-trailer transport vehicle (carrying Czirban's bulldozer) from Czirban's house in Madera County to Monterey County. Czirban followed the transport vehicle in his "service truck."

Vonderahe had operated Czirban's bulldozer during previous wildfire assignments. Furthermore, in the past, Vonderahe had his own EERA with Cal Fire for a bulldozer and had workers' compensation insurance for any extra operators. As with his

_____

[6] Unless otherwise indicated, all dates were in 2016.

8

earlier work for Czirban, Vonderahe expected to be paid for his work on the Soberanes fire.[7] Vonderahe had received more than $100 from Czirban (by check) for his "time driving [Czirban's] dozer between . . . June 15, 2015, through July 26, 2016." According to Vonderahe, two other bulldozer operators (including Reagan and a person named Wright) had driven Czirban's bulldozer on wildfire assignments during that timeframe.

Vonderahe testified on cross-examination that when he agreed to drive Czirban's bulldozer at the Soberanes fire, he "[a]bsolutely" felt he could have told Czirban no and was "under no obligation that [he] was aware of to agree to do that for Mr. Czirban." At the Soberanes fire, Czirban did not supervise Vonderahe or monitor his performance "in any way." Similarly, Vonderahe said he felt that he could have rejected Czirban's earlier requests to drive the bulldozer at previous wildfires. Vonderahe also did not recall Czirban supervising him in any way as he worked at prior wildfires. In addition, when Vonderahe had his own EERA with Cal Fire and had asked Czirban to drive a bulldozer for him, Vonderahe considered Czirban to be an independent contractor. Likewise, Vonderahe considered himself to be an independent contractor during the Soberanes fire.

On August 2, a Cal Fire battalion chief interviewed Czirban concerning the bulldozer accident that killed Reagan. Czirban said that when he received the request for assistance from Cal Fire on July 24, he "made some phone calls," "got some guys lined up to run," and then "packed some bags and headed out the door." Because Vonderahe was able to work for only part of the assignment, Czirban contacted Reagan to ask him if he, too, could operate Czirban's bulldozer. According to Czirban, Reagan had "r[u]n for a couple of guys" before as an "independent contractor." Reagan had his own company and an EERA with Cal Fire for a water truck. Reagan told Czirban that he would either replace Vonderahe at the fire ("so long as his water truck didn't get called" by Cal Fire) or "find a partner to come down and run with [Czirban]."

---

[7] Vonderahe ultimately did not accept payment for his work on the Soberanes fire because of his friendship with Czirban and Reagan's death.

When asked if Vonderahe was Czirban's "go to guy" and "a normal employee for you," Czirban answered, "No, he wasn't an employee. But he was just a normal guy that I would call" to operate the bulldozer at wildfire assignments. Czirban said Vonderahe had previously worked for him on wildfire assignments one or two times. Czirban had never used Reagan before, but Czirban had "seen him on fires." According to Czirban, Vonderahe and other people in Czirban's locality had EERAs with Cal Fire, and Czirban sometimes operated other people's equipment as a "private contractor" being paid "a set rate a day."

Reagan was originally scheduled to relieve Vonderahe on Wednesday, July 27, but Reagan told Czirban that he was going to travel to the fire on Tuesday. Czirban coincidentally had "some stuff going on" with his concrete business on Wednesday that he needed to address. Czirban called Reagan and asked him whether he wanted to "run" days or nights. When Reagan said he would work nights, Czirban was "freed [] up" to leave the fire on Tuesday (upon Reagan's arrival) and take care of his concrete business.

On Tuesday, July 26, Czirban called Reagan, met him in Los Banos, and gave him a "quick briefing" of approximately 10 minutes. Their plan was for Reagan to meet Vonderahe on the fire line that night. Czirban provided Reagan an "IAP" (presumably an incident action plan), information regarding Vonderahe's location and the road Reagan should take to get there, the pertinent radio frequency, the name of his contact, and a map. Reagan then headed to the fire and Czirban drove home.

When asked by the battalion chief about the process for entering into an EERA with Cal Fire, Czirban said a vendor with equipment had to contact a Cal Fire heavy equipment coordinator who would provide a checklist of the requirements. The heavy equipment coordinator would then conduct a safety inspection and ensure that the requirements for an EERA had been met.

On August 3, Melissa Huckaby, an enforcement representative with CSLB, began investigating Czirban's business. According to Huckaby, to obtain a new contractor's

10

license, contractors are required to have a workers' compensation policy to cover their employees. Contractors without employees do not need to have workers' compensation insurance but must "certify" that they do not have any employees that require coverage. Licensed contractors are required to apply for license renewal biennially and either file an exemption to the workers' compensation requirement or show proof of workers' compensation insurance. An unlicensed contractor who has employees is also required to have workers' compensation insurance. Huckaby determined that in March 2016, Czirban had filed an exemption from workers' compensation insurance with CSLB. In addition, Huckaby accessed the Workers' Compensation Insurance Reporting Bureau (WCIRB) database to check for workers' compensation policies for Czirban Concrete Construction; she found no results. This meant that, to WCIRB's knowledge, Czirban's business did not have a workers' compensation policy in place.

Diane Do, a tax hearing specialist with the California Employment Development Department (EDD), testified that EDD "mak[es] sure that businesses in California are complying with the unemployment insurance codes for payroll taxes." Do said that a "part-time employee earning over $100 in a single quarter" is considered an employee for EDD purposes. For such an employee, the employer must "register with [EDD] and then file a quarterly [payroll tax] return [] and report the wages." "[I]f the employee makes $99 then . . . this requirement [does not] appl[y]." The employer must file a quarterly return even if the employer had no employees during a particular quarter. Wages include commissions, bonuses, and cash payments paid by a business to an employee. EDD considers several factors under law to decide whether a worker should be classified as an independent contractor or an employee. EDD publishes on its website a guide setting forth factors for determining whether a worker is an employee.

EDD uses a database called the Accounting Compliance Enterprise System (ACES). ACES contains the content of any payroll tax returns for employers registered with EDD. If ACES does not include any information about a company, that means the

11

company never registered with EDD.  Do searched ACES using Czirban Concrete Construction's federal employer ID number and found no registration for any employer under that number.

Czirban presented no witnesses in his defense and only one documentary exhibit—an EERA between Foothill H20 (through its treasurer, Robert Reagan) and Cal Fire for provision of a water tender from April 2016 through April 2017.

## II.  DISCUSSION

Czirban raises three claims of error.  He contends that his convictions for tax evasion (count 5), failure to collect, account for, or pay taxes (count 6), and failure to secure payment of workers' compensation insurance (count 7) must be reversed because he did not have an employment relationship with his bulldozer drivers.  Czirban further argues that this matter should be remanded to allow the trial court to reduce his probationary term to a lawful period under Assembly Bill 1950.  Finally, he asserts that the trial court abused its discretion by failing to exercise that discretion when imposing the $10,000 fine under Labor Code section 3700.5.  We address Czirban's claims in turn.

A.  *Evidence of the Employment Relationship for Counts 5, 6, and 7*

Czirban contends that counts 5, 6, and 7 "all require, as a prerequisite to conviction, that the bulldozer drivers be [Czirban]'s employees rather than independent contractors.  But as a matter of law there was no employment relationship."  Czirban argues that "[t]he bulldozer drivers were independent contractors" "under *S.G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [(*Borello*)] (the test used [at trial])" and "under any test in this evolving area of law."  He maintains that, because the bulldozer drivers were independent contractors, as a matter of law, his convictions on counts 5, 6, and 7 should be reversed and retrial should be barred.

The Attorney General counters that Czirban's claim is "[a]t bottom" a challenge to the sufficiency of the evidence "to which deferential substantial evidence review applies," not de novo review.  The Attorney General further asserts that substantial

12

evidence establishes "[Czirban] and his bulldozer drivers had an employment relationship."

We first describe the elements of the offenses for which Czirban was convicted in counts 5, 6, and 7. We next turn to the dispute regarding the standard of review for Czirban's claim. Finally, we analyze the evidence of the work relationship between Czirban and his bulldozer drivers.

1. Elements of the Offenses

In count 5, the information alleged that, "[o]n or between June 20, 2015 through July 26, 2016," Czirban violated section 2117.5. A person violates section 2117.5 if he or she, "within the time required by [the Unemployment Insurance Code], willfully fails to file any return or report, or to supply any information with intent to evade any tax imposed by this code, or [] willfully and with like intent, makes, renders, signs, or verifies any false or fraudulent return, report, or statement or supplies any false or fraudulent information." (§ 2117.5.) Relatedly, section 1088 requires an employer to file various returns and reports with EDD at or within specified times, including a report of contributions, a quarterly return, and a report of wages paid to his or her workers in the form and containing any information that is prescribed.[8] (See § 1088.) Count 5 specified that the crime related to "Employment Development Department Payroll Tax Reports."

In count 6, the information alleged that, "[o]n or between June 20, 2015 through July 26, 2016," Czirban violated section 2118.5. A person violates section 2118.5 if he

---

[8] For example, as to the type of information that must be disclosed by employers to EDD, section 1088 provides: "The quarterly return shall include the total amount of wages, employer contributions required under Sections 976 [to the State "Unemployment Fund"] and 976.6 [to the State "Employment Training Fund"], worker contributions required under Section 984 [for State disability insurance], the amounts [of employee State income tax] required to be withheld under Section 13020, or withheld under Section 13028, and any other information as the [EDD] director shall prescribe. The report of wages shall include individual amounts required to be withheld under Section 13020 or withheld under Section 13028." (§ 1088, subd. (a)(1).)

13

or she, when "required by [the Unemployment Insurance Code] to collect, account for, and pay over any tax or amount required to be withheld[,] willfully fails to collect or truthfully account for and pay over the tax or amount." (§ 2118.5.) Like count 5, count 6 specified that the crime related to "Employment Development Department Payroll Tax Reports."

In count 7, the information alleged that, "[o]n or about July 26, 2016," Czirban violated Labor Code section 3700.5, subdivision (a). That section provides in pertinent part: "(a) The failure to secure the payment of compensation as required by this article by one who knew, or because of his or her knowledge or experience should be reasonably expected to have known, of the obligation to secure the payment of compensation, is a misdemeanor." (Lab. Code, § 3700.5, subd. (a); see also *People v. Petronella* (2013) 218 Cal.App.4th 945, 955 ["Labor Code section 3700.5, subdivision (a) punishes one who [] should have known of his or her obligation to secure workers' compensation insurance and failed to obtain coverage."].) Relatedly, Labor Code section 3700 states in pertinent part: "Every employer except the state shall secure the payment of compensation in one or more of the following ways: [¶] (a) By being insured against liability to pay compensation by one or more insurers duly authorized to write compensation insurance in this state. [¶] (b) By securing from the Director of Industrial Relations a certificate of consent to self-insure either as an individual employer, or as one employer in a group of employers, which may be given upon furnishing proof satisfactory to the Director of Industrial Relations of ability to self-insure and to pay any compensation that may become due to his or her employees."

"An element of a crime is 'an essential component of the legal definition of the crime.' " (*People v. Chaffer* (2003) 111 Cal.App.4th 1037, 1043; see also *People v. Van Winkle* (1999) 75 Cal.App.4th 133, 142–143.) At Czirban's trial, the parties agreed that the charges in counts 5, 6, and 7 required the district attorney to prove Czirban and his bulldozer operators had an employment relationship. We concur.

14

To convict Czirban of violating sections 2117.5 and 2118.5 by failing to report and withhold payroll taxes as alleged in counts 5 and 6, the prosecution had to prove beyond a reasonable doubt that the bulldozer drivers were Czirban's employees, rather than independent contractors. " 'The employer/employee relationship determines who must make contributions to the unemployment and disability funds. [Citation.] Where an employee performs services for an employer, the employer is required to make contributions and withhold taxes; where an independent contractor performs services for a principal, the principal is not required to withhold taxes or make contributions.' " (*West Hollywood Community Health & Fitness Center v. California Unemployment Ins. Appeals Bd.* (2014) 232 Cal.App.4th 12, 17; see also § 135 [defining " 'Employing unit' " for purpose of unemployment and disability compensation], § 621, former subdivision (b) [defining " 'Employee' " for purpose of unemployment and disability compensation (Stats. 2010, ch. 522, § 1[9])], § 675 [defining "Employer" for purpose of unemployment and disability compensation], § 13004 [defining " 'Employee' " for purpose of withholding tax on wages], § 13005 [defining "Employer" for purpose of withholding tax on wages].)

We reach the same conclusion with respect to the violation of the Labor Code alleged in count 7. The Workers' Compensation Act (Lab. Code, § 3200 et seq.) "extends only to injuries suffered by an 'employee,' which arise out of and in the course of his [or her] 'employment.' " (*Borello*, *supra*, 48 Cal.3d at p. 349; see also *Self-Insurers' Security Fund v. ESIS, Inc.* (1988) 204 Cal.App.3d 1148, 1156; Lab. Code,

---

[9] At the time of Czirban's crime and trial, section 621 former subdivision (b) defined " '[e]mployee' " as including "[a]ny individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." (§ 621, former subd. (b).) Division One of the Fourth District Court of Appeal held recently "that with respect to unemployment insurance taxes for work performed before January 1, 2020, the 'usual common law rules' within the meaning of section 621, former subdivision (b) are the *Borello* factors." (*Vendor Surveillance Corporation v. Henning* (2021) 62 Cal.App.5th 59, 75 (*Henning*).)

§ 3351 [defining " 'Employee' "]; Lab. Code, §§ 3353 [defining " 'Independent contractor' "], 3357 [employee presumption for non-independent contractors]; see also Lab. Code, §§ 3600, 3700.)

In addition, the parties agreed at trial that the trial court should resolve this factual question central to counts 5, 6, and 7 under the multifactor test articulated in *Borello*—not the three-part " 'ABC test' " adopted by the California Supreme Court for wage order claims, a year before Czirban's trial, in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903, 916, 964.  We decide, given the timing of the criminal acts alleged against Czirban, that the parties' agreement regarding the applicability of *Borello* was proper.  (See *Gonzales v. San Gabriel Transit, Inc.* (2019) 40 Cal.App.5th 1131, 1140; *Henning*, *supra*, 62 Cal.App.5th at pp. 62–63, 68–75] [*Borello* test governs assessment of unemployment insurance taxes for work performed before January 1, 2020].)

Although the trial court did not state explicitly that it reached its verdicts on counts 5, 6, and 7 using the *Borello* test, based on this record we presume the trial court accepted the agreement of the parties and used the *Borello* test (not the ABC/*Dynamex* test) when determining whether the district attorney proved Czirban's guilt beyond a reasonable doubt.  Moreover, although Czirban asserts on appeal that "California law in this area [of employee/independent contractor status] is still evolving" and mentions the various changes in law that have occurred since *Dynamex* and his trial, he does not argue that we must review his claim using the ABC test.  (See Stats. 2019, ch. 296, § 2 [Assembly Bill No. 5 (2019-2020 Reg. Sess.), amending both the Labor Code and Unemployment Insurance Code and codifying the *Dynamex* ABC test]; Stats. 2020, ch. 38, § 2 [repealing and replacing statutory changes enacted by Assembly Bill No. 5, revising certain exemptions to the ABC test, and creating additional exemptions]; *People v. Superior Court of Los Angeles County* (*Cal Cartage Transportation Express, LLC*) (2020) 57 Cal.App.5th 619, 626 [describing the recent changes in law].)  Rather, Czirban argues that the bulldozer drivers were independent contractors under *Borello* and additionally

16

maintains that "under any test there was no employment relationship" between himself and the bulldozer drivers. Furthermore, Czirban does not make any argument that the trial court should have used the ABC test when assessing the evidence on counts 5, 6, or 7. The Attorney General does not dispute the relevance of *Borello*. We therefore review Czirban's claim that the bulldozer drivers were independent contractors using the *Borello* test.

2. Standard of Review

Czirban relies on *Borello*, *supra*, 48 Cal.3d at p. 349 and *Lara v. Workers' Comp. Appeals Bd.* (2010) 182 Cal.App.4th 393, 396, 398 (*Lara*) to argue that the "question of worker status—employees or independent contractors—is a question of law that this Court reviews de novo."

In *Borello*, a grower sought mandamus writ review of a Division of Labor Standards Enforcement decision that certain agricultural laborers were employees rather than independent contractors. (*Borello*, *supra*, 48 Cal.3d at p. 348.) The California Supreme Court considered "whether agricultural laborers engaged to harvest cucumbers under a written 'sharefarmer' agreement [with the grower] are 'independent contractors' exempt from workers' compensation coverage." (*Id*. at p. 345.) Our high court explained in *Borello* that "[t]he determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the Division's decision must be upheld if substantially supported." (*Id*. at p. 349.) However, "[i]f the evidence is undisputed, the question becomes one of law [citation], but deference to the agency's view is appropriate." (*Ibid*.; see also *Germann v. Workers' Comp. Appeals Bd.* (1981) 123 Cal.App.3d 776, 783 ["[W]here the facts support only a single inference and conclusion, the question is one of law and a contrary finding by the [Workers' Compensation Appeals] Board is not sustainable on review."]) Further, our Supreme Court concluded on the undisputed facts in *Borello*, "as a matter of law[,] that [the grower] [] failed to demonstrate the cucumber sharefarmers are independent

17

contractors excluded from coverage under the [Workers' Compensation] Act." (*Borello*, *supra*, 48 Cal.3d at p. 360.)

In *Lara*, the Court of Appeal considered a petition for writ review filed by an injured worker challenging a Workers' Compensation Appeals Board decision against him. (*Lara*, *supra*, 182 Cal.App.4th at pp. 395–396.) After explaining that "the facts are undisputed" and " '[i]f only one inference may be drawn from all the facts, the question is one of law,' " (*id.* at p. 402) the Court of Appeal concluded that, under the *Borello* factors, "the undisputed evidence establishes, as a matter of law, that [petitioner] was not an employee of [the business], but was as an independent contractor when he was injured." (*Ibid*.)

We are not persuaded by Czirban that, under *Borello* and *Lara*, we should review de novo the trial court's implicit conclusion that Czirban had an employment relationship with his bulldozer drivers when it found him guilty of counts 5, 6, and 7. Czirban's argument for de novo review fails to acknowledge that he appeals from a criminal conviction and challenges the evidentiary basis for an element of offenses that the parties contested on their facts.[10] This procedural posture dictates our standard of review. "It is the prosecution's burden in a criminal case to prove every element of a crime beyond a reasonable doubt. [Citation.] To determine whether the prosecution has introduced sufficient evidence to meet this burden, courts apply the 'substantial evidence' test. Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cuevas*

---

[10] Both parties argued at trial that the employment status of the bulldozer drivers was an element of counts 5, 6, and 7, and the trial court apparently reached its verdicts with that understanding. Neither Czirban nor the Attorney General on appeal challenges those conclusions.

(1995) 12 Cal.4th 252, 260 (*Cuevas*), italics omitted; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318 (*Jackson*); *People v. Jimenez* (2019) 35 Cal.App.5th 373, 392.)  "In applying this test, we . . . presume in support of the judgment the existence of every fact the [factfinder] could reasonably have deduced from the evidence."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'  [Citation.]  A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the [factfinder]'s verdict."  (*Ibid*.; see also *People v. Jones* (1990) 51 Cal.3d 294, 314.)

A standard of review that might be appropriate in a writ proceeding or other civil context (see *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056–1059) has no pertinence when reviewing a criminal conviction, particularly one that does not implicate constitutionally protected conduct.  (See *Jackson*, *supra*, 443 U.S. at pp. 316–319; cf. *In re George T.* (2004) 33 Cal.4th 620, 632 [concluding that "a reviewing court should make an independent examination of the record in a [Penal Code] section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat."]; *id*. at p. 634 ["Independent review is not the equivalent of de novo review;" "under independent review, an appellate court exercises its independent judgment to determine whether the facts satisfy the rule of law"]; *People v. Lindberg* (2008) 45 Cal.4th 1, 37 [rejecting independent review under *George T.* for the hate-murder special circumstance finding where no First Amendment issues were implicated.)

Therefore, we decide that the well-established standard governing review of the sufficiency of trial evidence to support a criminal conviction applies to Czirban's claim that the bulldozer drivers were not his employees.  (See *Cuevas*, *supra*, 12 Cal.4th at p. 260.)

19

### 3. Analysis of the Trial Evidence

Turning to our analysis of the evidence concerning the employment status of the bulldozer drivers, we first describe the multifactor test of *Borello*.

In *Borello*, the California Supreme Court explained that "California decisions applying [] statutes [enacted for the protection of employees] uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired.' " (*Borello*, *supra*, 48 Cal.3d at p. 350.) "But courts 'have long recognized that the "control" test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements.' [Citation.] So, while the right to control work details 'is the "most important" or "most significant" consideration, the authorities also endorse several "secondary" indicia of the nature of a service relationship.' [Citation.] Thus, ' "the right to discharge at will, without cause," ' is ' "[strong] evidence in support of an employment relationship. . . ." ' [Citation.] Additional factors include '(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.' " (*Arzate v. Bridge Terminal Transport, Inc.* (2011) 192 Cal.App.4th 419, 426, quoting *Borello*, at pp. 350–351.)

" 'Generally, . . . the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations.' " (*Borello*, *supra*, 48 Cal.3d at p. 351.) "Each service arrangement must be evaluated on its

20

facts, and the dispositive circumstances may vary from case to case." (*Id*. at p. 354.) Further, "[t]he label placed by the parties on their relationship is not dispositive, and subterfuges are not countenanced." (*Id*. at p. 349.)

The California Supreme Court in *Borello* also described other factors "that all are logically pertinent to the inherently difficult determination whether a provider of service is an employee or an excluded independent contractor for purposes of workers' compensation law." (*Borello*, *supra*, 48 Cal.3d at p. 355.) "(1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working relationship; and (5) whether the service rendered is an integral part of the alleged employer's business."

Examining the trial evidence under the *Borello* test, we decide there is sufficient evidence of an employment relationship between Czirban and his bulldozer drivers during the relevant period. The evidence demonstrates that it was Czirban who decided whether to accept 24-hour resource assignments from Cal Fire (including the Soberanes fire assignment), knowing that he would need to enlist other bulldozer drivers to complete them. Czirban thus controlled the overall scope of the work, the number of operators needed for any assignment he accepted, who those other operators would be, and the overall period during which the operators would work. These circumstances demonstrate Czirban's " 'right to control the manner and means of accomplishing the result desired,' " (*Borello*, *supra*, 48 Cal.3d at p. 350) i.e., to have certain workers operate his bulldozer to fulfill his chosen wildfire assignments so he could obtain a higher rate of compensation from Cal Fire.

Czirban's characterization of the wildfire assignments as " 'one-off' emergency arrangements" fails to account for the fact that Czirban signed a multi-year agreement with Cal Fire to provide his bulldozer and operators as needed, held himself out to be an

21

employer with workers' compensation insurance when he signed the EERA, and utilized Vonderahe's services consistently for accepted assignments during wildfire season. Thus, Czirban's bulldozer drivers were integrated into his business of providing equipment and operators to Cal Fire, which "is a strong indicator that [Czirban] functions as an employer." (*Borello*, *supra*, 48 Cal.3d at p. 357.)

Further, Czirban owned and provided the bulldozer that his drivers operated during wildfire assignments, and the bulldozer was subject to inspection by Cal Fire before Czirban and Cal Fire signed the EERA. Czirban also admittedly provided Reagan a "quick briefing" and necessary information for his impending work on the Soberanes fire when they met in Los Banos on July 26. Thus, it was Czirban (not the drivers) who controlled and supplied the main instrumentalities for their work on the fire lines and who had primary power over the safety of the equipment he provided to his drivers. Although Czirban did not actively supervise his bulldozer drivers as they operated his bulldozer on the fire line, Czirban utilized drivers who knew how to operate his equipment and the nature of the work itself (which was done under direction from Cal Fire) "ma[de] detailed supervision . . . unnecessary." (*Borello*, *supra*, 48 Cal.3d at pp. 356–357.)

During Czirban's chosen wildfire assignments, his bulldozer drivers also were not "engaged in a distinct occupation or business." (*Borello*, *supra*, 48 Cal.3d at p. 351.) Vonderahe and Reagan were experienced heavy equipment operators, but Vonderahe was a Caltrans employee and Reagan had a business with an EERA for a water truck. Czirban hired them to provide a personal service (i.e., to drive his bulldozer) so he could benefit from his own business's EERA. They did not have an opportunity to independently incur profit or loss through their own pursuits while operating Czirban's bulldozer. They were paid by Czirban for the time they spent on the fire line pursuant to Czirban's wildfire assignment. (See *Borello*, at pp. 357–358.) That Vonderahe and Czirban apparently believed their relationship was one involving an independent contractor and hirer is not dispositive and does not override the other evidence

22

demonstrating an employee and employer relationship under *Borello*'s multifactor test. Furthermore, Czirban and Vonderahe had, in the past, acted in ways that demonstrated an understanding that they were in fact employers who needed to have workers' compensation insurance for extra bulldozer operators hired to accomplish their EERA assignments. This evidence provided a basis for the trial court to discount the significance of the "label" Czirban and Vonderahe placed on their relationship. (See *id*. at p. 349.)

In sum, based on the entire trial record viewed in the light most favorable to the judgment, we conclude there is sufficient evidence from which a reasonable trier of fact could find beyond a reasonable doubt that Czirban had an employment relationship with his bulldozer drivers as required for guilty verdicts on counts 5, 6, and 7.

B. *Czirban's Probationary Term*

At the time of Czirban's sentencing hearing in December 2019, the trial court had the authority to impose a three-year probationary term. (Former Pen. Code, § 1203.1, subd. (a).) On January 1, 2021, Assembly Bill 1950 took effect and reduced the maximum probationary term for most felony offenses to two years. (Stats. 2020, ch. 328, § 2; Pen. Code, § 1203.1, subds. (a), (m); *People v. Quinn* (2021) 59 Cal.App.5th 874, 879 (*Quinn*).) Penal Code section 1203.1, subdivision (a), now states in relevant part: "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding two years, and upon those terms and conditions as it shall determine." (Pen. Code, § 1203.1, subd. (a).) There is an exception to the new two-year limitation for certain felonies, but that exception does not apply here. (See Pen. Code, § 1203.1, subd. (m).)

Czirban contends the statutory change effected by Assembly Bill 1950 applies retroactively to his probationary term. The Attorney General does not contest that Assembly Bill 1950 is an ameliorative change that applies to cases not yet final on

23

appeal. We agree that Assembly Bill 1950 applies to Czirban, and the suspension of imposition of Czirban's sentence and his related probationary term may not exceed two years. (*Quinn*, *supra*, 59 Cal.App.5th at pp. 879–885; *People v. Sims* (2021) 59 Cal.App.5th 943, 955–964 (*Sims*); Pen. Code, § 1203.1, subds. (a), (m).)

As for the remedy that should follow from the current two-year limitation in Penal Code section 1203.1, both Czirban and the Attorney General contend that we should remand the matter so the trial court can modify Czirban's probation. We concur. (See *Sims*, *supra*, 59 Cal.App.5th at p. 964; *People v. Lord* (2021) 64 Cal.App.5th 241, 245–246.) Thus, we will reverse the order of probation and remand the matter to the trial court for resentencing to modify Czirban's probationary term in accordance with current Penal Code section 1203.1, subdivision (a).

C. *$10,000 Fine under Labor Code Section 3700.5, Subdivision (a)*

The probation officer's report prepared for Czirban's sentencing hearing recommended, as condition No. 17 of Czirban's probation, that he "[p]ay a fine of $10,000.00 to the California Workers' Compensation Fraud Account through Monterey County Revenue Department. ([Labor Code section] 3700.5)."[11]

At Czirban's sentencing, the parties and the trial court discussed another proposed condition that recommended fines under the Unemployment Insurance Code (condition No. 26), but they did not reference condition No. 17. Further, the trial court mentioned its practice of not "read[ing] all the [probation] conditions" out loud and inquired if defense counsel was "asking [the court] to do that." Defense counsel responded, "I am not." The court then proceeded to order probation with multiple conditions

---

[11] Labor Code section 3700.5, subdivision (a), states that a violation of its terms "is a misdemeanor punishable by imprisonment in the county jail for up to one year, or by a fine of up to double the amount of premium, as determined by the court, that would otherwise have been due to secure the payment of compensation during the time compensation was not secured, but not less than ten thousand dollars ($10,000), or by both that imprisonment and fine."

recommended in the probation report. The court stated the probation conditions it had decided to impose by their number or number range (including condition Nos. 17 and 26); it also articulated modifications to certain conditions and struck others entirely.[12] Defense counsel did not object to the imposition of condition No. 17, and Czirban said he understood and accepted the terms and conditions of his probation.

On appeal, Czirban argues that "[t]he trial court abused its discretion by failing to exercise its discretion regarding whether to impose" condition No. 17, because a "review of the entire sentencing record shows the trial court did not understand that it had discretion to not impose the fine at all." He asserts that, on remand for resentencing, the trial court should exercise its discretion to strike or reduce the fine. The Attorney General counters that Czirban forfeited his claim of error by failing to object in the trial court and, in any event, his claim is meritless.

Assuming arguendo that Czirban did not forfeit his claim, we are not persuaded that it has merit. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) " '[A] court that is unaware of its discretionary authority cannot exercise its informed discretion.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) "Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing." (*People v. Brown* (2007) 147 Cal.App.4th 1213, 1228.) "Remand for resentencing is not required, however, if the record demonstrates the trial court was aware of its sentencing discretion. [Citations.] Further, remand is unnecessary if the record is silent concerning whether the trial court misunderstood its sentencing discretion. Error may not be presumed from a silent record. [Citation.] ' "[A] trial court is

---

[12] As for condition No. 26, the trial court suspended the two $20,000 fines recommended in the probation report.

presumed to have been aware of and followed the applicable law." ' " (*Id*. at pp. 1228–1229.)

Here, neither the parties nor the trial court discussed the substance of condition No. 17 at Czirban's sentencing. The condition was only mentioned by number when the trial court stated the conditions it was imposing. The record contains no evidence that the trial court was unaware of its discretion whether to impose condition No. 17, and thus we will not presume the court failed to exercise its discretion on this issue. Accordingly, we reject Czirban's claim on its merits.

Nevertheless, when the trial court on remand modifies Czirban's probationary term, it should issue a new sentencing minute order that accurately reflects the probation conditions it has imposed. For the trial court's convenience, we note the following errors and omissions in the current sentencing minute order, dated December 13, 2019: (1) omission of the $10,000 fine under Labor Code section 3700.5 (condition No. 17); (2) misstatement of Czirban's county of residence as Monterey County instead of Madera County (condition No. 3); (3) omission of the warrantless search condition for Czirban's business (condition No. 9); and (4) omission of the booking requirement (condition No. 41).[13]

## III. DISPOSITION

The order of probation is reversed, and the matter is remanded to the trial court for resentencing with directions to modify Czirban's term of probation in accord with Penal Code section 1203.1, subdivision (a), as amended by Assembly Bill No. 1950 (2019-2020 Reg. Sess.). The trial court also is directed to issue a new sentencing minute order upon

---

[13] Although two restitution conditions (Nos. 32 and 33) also do not appear on the sentencing minute order, we do not direct the minute order corrected to include them, because the parties do not substantively discuss them in their briefs and they are apparently the subject of a separate appeal.

26

resentencing that accurately reflects the terms and conditions of Czirban's probation.  In all other respects, the judgment is affirmed.

_____
                            Danner, J.

WE CONCUR:

_____
Greenwood, P.J.

_____
Grover, J.

**H047748**
*People v. Czirban*

Trial Court:     County of Monterey

Trial Judge:     Hon. Andrew G. Liu

Counsel:         Peggy Ann Headley, by appointment of the Court of Appeal under the
                 Sixth District Appellate Program, for Defendant and Appellant.

                 Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief
                 Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant
                 Attorney General, Amit Kurlekar and Victoria Ratnikova, Deputy
                 Attorneys General, for Plaintiff and Respondent.

**H047748**
*People v. Czirban*